**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ELWOOD QUESADA and others similarly situated,**<br><br>          **Plaintiff(s),**<br><br>     **vs.**<br><br>**BANC OF AMERICA INVESTMENT SERVICES, INC. N/K/A MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,**<br><br>          **Defendant(s).** | **Case No.: 11-CV-01703 YGR**<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

Plaintiff Elwood Quesada[1] seeks certification of a class of California clients of Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., successor in interest to Banc of America Investment Services, Inc. ("Merrill Lynch" or "Defendant"), who allegedly had their telephone calls surreptitiously recorded by Defendant's employees. Plaintiff's Third Amended Complaint (Dkt. No. 33 ("TAC")) brings one claim for Violation of California's Invasion of Privacy Act, Cal. Penal Code §§ 632 & 637.2.

Having carefully considered the papers submitted and the pleadings in this action, and the argument of counsel, for the reasons set forth below, the Court hereby **DENIES** the Motion for Class Certification. Plaintiff did not establish that common questions predominate over individual issues such that a class action is a superior method for fairly and efficiently adjudicating this controversy.

---

[1] The motion was filed on behalf of two named Plaintiffs, Elwood Quesada and James DeRosa, but Mr. DeRosa has withdrawn as a named Plaintiff.

# I.   BACKGROUND

The complaint alleges that in late 2009 through early 2010, Defendant's employees recorded confidential telephone conversations with its California clients without the clients' knowledge or consent in violation of California's Invasion of Privacy Act.  (TAC ¶¶ 7, 20, 26, 29, 37.)  Defendant made these telephone calls to obtain client approval to transfer their brokerage accounts from Banc of America Investment Services, Inc. ("BAI") to Merrill Lynch, which had merged into Bank of America.  (*See* Declaration of David Sorensen ("Sorensen Dec."), ¶ 2; TAC ¶¶ 18-20.)  Defendant telephoned its BAI clients to give them the option of closing their brokerage account or transferring their account to a Merrill Lynch brokerage service.  (Sorensen Dec. ¶ 2; TAC ¶ 19.)

Prior to a 2008 merger with Merrill Lynch, a division of Bank of America, BAI, offered a brokerage product known as the Money Manager Account ("MMA") which was linked to a client's checking account.  (*See* Sorensen Dec. ¶ 2.)  Following the merger, BAI decommissioned the MMA product and separated its clients' brokerage and checking accounts.  (*Id.*)  It then gave clients the option of closing their MMA account or transferring their account to Merrill Lynch.

Members of the bank's Separation Team made the calls at issue from call centers in Waltham, Massachusetts, Lincoln, Rhode Island, and Charlotte, North Carolina, and notified clients of the option either to close or transfer their MMA accounts to Merrill Lynch.  (*See* Sorensen Dec. ¶ 2; TAC ¶ 20.)  Clients first received letters informing them of this option, and for select clients, a member of the Separation Team followed-up with a telephone call to assist with any questions the client might have had, and to process any account changes.  (*See* Sorensen Dec. ¶ 3.)  Members of the bank's Separation Team made these telephone calls on a "rolling" basis, by geographic region, beginning in January 2010 with calls to its California clients.  (*Id.*)

## A.   PLAINTIFF'S EVIDENCE

Named plaintiff Elwood Quesada alleges that in early 2010, Merrill Lynch recorded two telephone calls without his consent.  (*See* TAC ¶¶ 26-27.)  In January 2010, Mr. Quesada received a telephone call from a member of the bank's Separation Team to facilitate the transfer of his brokerage accounts.  (Declaration of Elwood Quesada ("Quesada Dec."), Dkt. No. 77 at 10, ¶ 2.)  Mr. Quesada informed the caller that he needed to discuss the matter with his wife and requested the

United States District Court
Northern District of California

Separation Team member call back in a few days.  (*Id.* ¶ 4.)  A few days later, Mr. Quesada received a second telephone call from a member of the bank's Separation Team during which Mr. Quesada approved the transfer of his brokerage accounts.  (*Id.* ¶¶ 5-6.)  In his declaration, Mr. Quesada confirms that Defendant did not inform him that either telephone call was being recorded.  (*Id.* ¶ 3.) However, he expected that the telephone calls were *not* being recorded because the calls concerned his finances.  (*Id.* ¶ 7.)

In support of his Motion for Class Certification, Plaintiff has provided two declarations from Siobhan Fitzgerald, a member of the bank's Separation Team who worked at the Waltham, Massachusetts call center from December 2009 through June 2010.  (*See* Declaration of Siobhan Fitzgerald ("Fitzgerald Dec."), Dkt. No. 67, at 13; Third Declaration of Siobhan Fitzgerald ("Third Fitzgerald Dec."), Dkt. No. 77, at 12.)  During her deposition Ms. Fitzgerald testified that Separation Team members underwent a two-week training course in Lincoln, Rhode Island before making calls. (Deposition of Siobhan Fitzgerald ("Fitzgerald Dep."), Ex. C, Dkt. No. 73-3 at 28:9-29:20.) According to Ms. Fitzgerald, Separation Team members were not trained or instructed to disclose to clients that they were on a recorded line.

Ms. Fitzgerald states that it was her practice to advise each client that their call was being recorded but the Separation Team members working around her "did not[2] advise clients that their calls would be recorded."  (Second Declaration of Siobhan Fitzgerald ("Second Fitzgerald Dep."), Dkt. No. 79-2, ¶ 5.)  Ms. Fitzgerald attached a script to her first declaration, and claims that her superiors told her the same script was being used by Separation Team members at all call centers. (Fitzgerald Dec. ¶ 3 & Ex. 1; Third Fitzgerald Dec. ¶ 1.)  The script does not instruct the Separation Team member to notify clients that the call is being recorded.  (*See* Fitzgerald Dec., Ex. 1.)[3]

---

[2] This may be a typo because the declaration was prepared by Defendant who offers the document to support its position that Separation Team members notified clients that calls were being recorded.

[3] After making the declaration in support of Plaintiff's motion, Ms. Fitzgerald contradicted herself at her deposition, and again, subsequently, in a second declaration prepared by the Defendant.  In her second declaration, and at deposition, Ms. Fitzgerald stated that the script attached to her First Declaration was incomplete, that she did not review the script prior to signing the declaration and that she did not provide Plaintiff's counsel with a copy of the script.  (Second Fitzgerald Dec. ¶ 3.)  Plaintiff attached to his reply brief a third declaration to *retract* the statements she made at deposition.  At deposition and in her second declaration, Ms. Fitzgerald explained that her first declaration contained inaccuracies because she has dyslexia and reviewing documents was difficult for her.  (*See* Second Fitzgerald Dec. ¶ 2.)  Ms. Fitzgerald's third

United States District Court
Northern District of California

1    In February 2010, Ms. Fitzgerald sent an email to David Sorensen, the Site Manager of the

2  Waltham, Massachusetts call center, to inform him that recording telephone calls without the client's

3  consent is illegal in California and that Separation Team members were not disclosing to clients that

4  they were recording their calls.  (Fitzgerald Dec. ¶ 5; Third Fitzgerald Dec. ¶ 5.)  Following Ms.

5  Fitzgerald's email, on February 3, 2010, Mr. Sorenson emailed Separation Team members:  "We

6  must state that we are calling on a recorded line anytime that we make an outbound dial in this

7  campaign."  (Sorensen Dec., Ex. J at 3.)[4]  According to Ms. Fitzgerald, this was the first time

8  Separation Team members were instructed to disclose to clients that their telephone call was being

9  recorded.  (Fitzgerald Dec. ¶¶ 3, 5; Third Fitzgerald Dec. ¶¶ 3-5.)  By this time, however, Merrill

10  Lynch had finished calling all 80,000 of its California clients.  (Fitzgerald Dec. ¶¶ 6-7; Second

11  Fitzgerald Dec.¶ 2.)

12    **B.    DEFENDANT'S EVIDENCE**

13    Merrill Lynch disputes that its employees did not notify clients that their calls were being

14  recorded.  Merrill Lynch argues that its written policy has always required that employees notify

15  customers if a call is being recorded.  Merrill Lynch has provided the declaration of Ms. Fitzgerald's

16  manager, Mr. Sorensen, as well as exhibits of training materials, scripts, and the policies governing

17  Separation Team members in their communications with clients.

18    Mr. Sorensen claims that prior to Ms. Fitzgerald's February 2010 email, he was aware that

19  recording telephone calls without client consent was illegal in California.  (Sorensen Dec. ¶ 14.)  Mr.

20  Sorensen states that Ms. Fitzgerald informed him that some Separation Team members were

21  inconsistently notifying customers that their calls were being recorded.  (*Id.* ¶ 12.)  According to Mr.

22  Sorensen, some Separation Team members may not have disclosed that their call was being recorded,

23  notwithstanding the actual policy requiring notification.  (*Id.* ¶ 15.)

24

25

---

26  declaration retracts the recantation in her second declaration by explaining that she *did* provide the script to
Plaintiff's counsel, but she "had forgotten that at [her] deposition."  (Third Fitzgerald Dec. ¶ 2.)

27  [4] Ms. Fitzgerald immediately emailed Mr. Sorenson to say "Thanks Dave!" to which Mr. Sorensen responded
28  to Ms. Fitzgerald "THANK YOU … we had some doing and perhaps some not … this should get everyone on
the same page."  (Sorensen Dec., Ex. J at 2 (ellipses in original).)

United States District Court
Northern District of California

1    Mr. Sorensen states that before members of the Separation Team began to make calls, they

2    underwent a two-week training course.  (*Id.* ¶ 6.)  Part of the training included instruction on the

3    "Investment Center Client Service Specialist User's Guide," which provided, among other things,

4    that "[a]ssociates are required to state that the caller is on a recorded line."  (*Id.*, Ex. B, Dkt. No. 74-

5    2, at 5.)  Earlier versions of the "User's Guide" also stated that "[a]ssociates are required to state that

6    the caller is on a recorded line."  (*See id.*, Exs. C-F.)

7    According to Mr. Sorensen, the script attached to Ms. Fitzgerald's Declaration is

8    "incomplete–it is merely one page of talking points taken from a more extensive training manual."

9    (Sorensen Dec. ¶ 13.)  Mr. Sorensen explains that the "more extensive training manual" is attached to

10   his declaration as Exhibit G.  Page 4 of that Exhibit is a script for Separation Team members to open

11   calls:  "Mr./Ms. <Client>, this is <insert name> calling from Merrill Lynch Wealth Management on a

12   recorded line."  (Sorensen Dec., Ex. G at 4.)

13   Mr. Sorensen states that Separation Team members' calls were randomly monitored for

14   compliance with the policies contained in the User Guide, which included the requirement that the

15   caller inform the client they were speaking on a recorded line.  (Sorensen Dec. ¶ 9.)  Merrill Lynch

16   monitored approximately five to eight telephone calls per month for each Separation Team member.

17   (*Id.*)  When monitoring a call, the reviewer used a Score Sheet to judge the Separation Team

18   member's performance and the reviewer based the evaluation on a number of factors, including

19   compliance with the requirement to inform clients their calls were being recorded.  (*Id.* ¶¶ 9-10.)  A

20   Separation Team member's evaluation could affect his or her compensation.  (*Id.* ¶ 10.)

21   Although Defendant recorded telephone calls, it destroyed all call recordings, in the normal

22   course of business, 90 days after the call was made.  (*Id.* ¶ 11.)  Because this lawsuit was filed more

23   than 90 days after the calls at issue, Merrill Lynch destroyed all but one call recording, which it

24   retained for training purposes.  (*Id.*)  In that call the Separation Team member informs the client that

25   she is speaking on a recorded line.  (*See id.*, Exs. H, I.)

26   **II.    DISCUSSION**

27   Plaintiff brings the putative class action on behalf of himself and all other similarly-situated

28   clients of Merrill Lynch to remedy the alleged invasion of privacy when Defendant recorded

United States District Court
Northern District of California

confidential telephone conversations without its California clients' consent.  Plaintiff proposes the following class definition:

> All individuals in California whose telephone calls were recorded by Defendant without their consent from December 2009 through Spring 2010.[5]

(TAC ¶ 7.)

## A.  LEGAL STANDARD

Class Certification under Rule 23 is a two-step process:  First, one must determine if the prerequisites to certification in subpart (a) are met: numerosity, commonality, typicality, and adequacy.[6]  Second, one must establish one of the bases in subpart (b)—here, Plaintiff argues for (b)(3), that common questions predominate and a class action is superior to individual actions.

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.");  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("of overriding importance, courts must be mindful that the Rule … sets the requirements that they are bound to enforce … .  The text of [the Rule] … limits judicial inventiveness.").  A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979) (quoted in *Wal-Mart, supra*, 131 S.Ct. at 2550).  While the Court retains broad discretion to certify a class, because representative actions are the exception and not the norm, the Court must conduct a "rigorous analysis" to determine whether the plaintiff has

---

[5] This definition is overbroad for two reasons.  First, the class description includes individuals whose non-confidential calls were recorded.  Second, this class includes all individuals and not just clients who were contacted by members of the bank's Separation Team to notify them of the option to transfer accounts from BAI to Merrill Lynch accounts.

[6] The four prerequisites that a party must meet under Rule 23(a) before a case may be certified as a class action are:  (1) numerosity (the class is so numerous that joinder of all members is impractical); (2) commonality (there are questions of law or fact common to the class); (3) typicality (the claims or defenses of the representative parties are typical of those of the class); and (4) adequacy of representation (the representatives will adequately protect the interests of the class).  Fed. R. Civ. P. 23(a).

United States District Court
Northern District of California

established the requirements of Rule 23 to ensure that a departure from the general rule of individual

litigation is justified.  *General Tel. Co. v. Falcon*, 457 U.S. 147, 160-61 (1982).

### B.    DO COMMON QUESTIONS PREDOMINATE?

In this case, the dispute between the parties centers primarily on whether, pursuant to Rule

23(a)(2), questions of fact common to the class exist, and if so, whether such common questions

predominate over individual issues pursuant to Rule 23(b)(3).  The Court first will set forth the legal

framework for the analysis of Rule 23(a)(2) commonality and Rule 23(b)(3) predominance.  Because

this second factor essentially is dispositive, the Court focuses its discussion on it.

#### 1.    *Rule 23(a)(2) Commonality*

A class may not be certified unless "there are questions of law or fact common to the class."

Fed. R. Civ. P. 23(a)(2).  For purposes of the commonality analysis, a common question is one that,

when answered as to one class member, will advance the resolution of the claims of the other

members of the putative class.  *Wal-Mart*, *supra*, 131 S.Ct. at 2551 (their claims must depend on a

common contention and "be of such a nature that it is capable of classwide resolution—which means

that determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke.").  Thus, a "common question" will result in a common answer that will

be critical to the resolution of the litigation.  *See id.* ("[a]ny competently crafted class complaint

literally raises common 'questions.'") (quoting Richard A. Nagareda, *Class Certification in the Age

of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131-32 (2009) (alteration in original)).  Such common

question must be susceptible to common proof.  *Id.*  Accordingly, the commonality determination

may overlap with the merits to some degree.  *Falcon*, *supra*, 457 U.S. at 160.[7]

---

[7] Plaintiff cites to *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 167-68 (1974) for the opposite proposition and argues that an inquiry into the merits of the case is forbidden.  This is an incorrect statement of the law and an incomplete reading of *Eisen*.  There, the Supreme Court admonished the district court for making "a preliminary inquiry into the merits" in order to shift 90% of the notice costs to the defendant.  The issue before the Supreme Court was not the propriety of certification of the class, but whether it was appropriate to allocate the costs of notice to the defendant based upon a finding that the plaintiffs were likely to succeed on the merits.  In *Falcon*, the Court noted, in *dictum*, that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  457 U.S. at 160.  That *dictum* is now established law.

2. *Rule 23(b)(3) Predominance*

To certify a damages class under Rule 23(b)(3), as Plaintiff proposes, he must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The shared legal or factual issues must be of sufficient importance to the case that the Court is convinced that the most efficient, fair and sensible method of adjudication is through a class action. Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:274 (citing *Califano*, *supra*, 442 U.S. at 701). Therefore, the predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon. v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem*, *supra*, 521 U.S. at 623) (internal quotation marks omitted). Where questions common to class members represent significant issues that can be resolved in a single adjudication, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (internal quotation marks and citation omitted).

3. *Is There A Common Question?*

In determining whether common issues predominate, the Court first identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses); then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried. *See* Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3).")).

The elements for a violation of California's Invasion of Privacy Act are: (i) the intentional recording, (ii) of a confidential communication, (iii) without consent. *See* Cal. Pen. Code § 632(a). Plaintiff argues that there are two common questions in this case: (1) did Defendant obtain consent

United States District Court
Northern District of California

1  to obtain telephone calls; and (2) did the phone calls contain confidential information?  Plaintiff

2  argues that the first question does not need to be addressed when certifying a class (it does) because

3  it goes to liability and that the second question has been admitted (it has not).  According to Plaintiff,

4  the first question can be answered with common proof.  (Reply 2; Mot. 7 ("it is impossible to discern

5  any issue in this case that is not common to all members of the class.").)  Merrill Lynch argues that

6  the consent question cannot be answered without an individual inquiry to determine which customers

7  were informed that they were on a recorded call.  As set forth below, Plaintiff has not offered any

8  method for fairly and efficiently adjudicating the controversy without resort to individual testimony

9  from each Merrill Lynch client whose telephone call was recorded and the Separation Team member

10  who made the telephone call.

      Plaintiff seems to believe that Ms. Fitzgerald's testimony alone will prove the consent issue

12  for all 80,000 class members.  Although Plaintiff concedes that "there is a ***factual dispute*** over

13  whether Defendant disclosed to clients that it was recording their calls" (Reply 2 (emphasis in

14  original)), according to Plaintiff, resolution of this factual dispute is as simple as he said-she said:

15  Ms. Fitzgerald, who worked at the Waltham, Massachusetts call center would testify that Defendant

16  did not disclose to its clients that it was recording their telephone calls, and Mr. Sorensen, who

17  managed the Waltham, Massachusetts call center, would testify that Defendant did disclose; then let

18  the jury decide who to believe.

      Ms. Fitzgerald's testimony, even if believed,[8] is not sufficient to demonstrate the consent

20  issue as to all class members.  She worked in one call center and does not purport to know whether

21  Separation Team members in any other call center disclosed that calls were being recorded.  At oral

22  argument Plaintiff's counsel proposed the foundation for Ms. Fitzgerald to testify about the practices

23  of Separation Team members in the other call centers, namely, she underwent a two-week training

24  session with other Separation Team members and no one was trained to disclose that the call was

25  recorded.  Plaintiff argues that from this foundation an inference may be drawn with respect to all

26  calls made.  The evidence does not support Ms. Fitzgerald's testimony or this inference.  According

27  _____

28  [8] Based upon Ms. Fitzgerald's conflicting affidavits and deposition testimony alone, her credibility has been challenged.

United States District Court
Northern District of California

to Mr. Sorenson, Separation Team members were trained to disclose that the caller was on a recorded line and the exhibits of training materials Merrill Lynch has provided support Mr. Sorenson's testimony.  Contrary to Ms. Fitzgerald's testimony, Separation Team members were provided with training material instructing them to disclose to clients that the caller was on a recorded line.

Merrill Lynch has provided additional evidence to show that the consent question is not capable of classwide resolution.  The proffered evidence shows that Separation Team members were (i) required to disclose that calls were being recorded pursuant to Merrill Lynch's written policy, (ii) monitored for compliance with this written policy, and (iii) compensated based upon compliance with this written policy.  In an attempt to show that Separation Team members did not follow Merrill Lynch's written policy, Plaintiff relies upon two emails Mr. Sorensen sent after Ms. Fitzgerald informed him that Separation Team members were not notifying clients they were on a recorded line.  The first email, sent to all Separation Team members provides that:

> For clarification:  We must state that we are calling on a recorded line anytime that we make an outbound dial in this campaign.
>
> A suggested talking point may be:
> Hello, Mr. Johnson, this is Jane Doe calling from Merrill Lynch Wealth management on a recorded line ….

(Sorensen Dec., Ex. J.)  Mr. Sorensen's second email, sent only to Ms. Fitzgerald, was in response to an email Ms. Fitzgerald sent to Mr. Sorenson thanking him for sending the above email, and provided "we had some doing and perhaps some not … this should get everyone on the same page." (*Id.* (ellipsis in original).)  Plaintiff interprets use of the word "clarification" rather than "remind," and the suggestion of a "talking point" rather than reference to an existing script or manual as evidence that no Separation Team member followed Defendant's written policy.  (Reply 4.)  There is a conceptual gap between providing "clarification" to "get everyone on the same page" and Plaintiff's conclusion that no Separation Team member followed written company policy.  *See Wal-Mart*, *supra*, 131 S.Ct. at 2552-55 (discussing "two ways in which that conceptual gap [between individual claim of discrimination and unsupported allegation that the company has a policy, and a class of persons who have suffered the same injury] might be bridged").

United States District Court
Northern District of California

1    At best, Ms. Fitzgerald can testify to her own practice, which was to disclose to clients that

2    they were on a recorded line, and Ms. Fitzgerald can testify to the disclosure practices of Service

3    Team members in her immediate vicinity.  This is not evidence that is capable of establishing the

4    consent issue as to all 80,000 Merrill Lynch clients.  Nor can the proffered evidence establish the

5    consent issue as to the clients who received calls from the Waltham, Massachusetts call center where

6    Ms. Fitzgerald worked.[9]

7    While there is a common question of consent that must be answered to determine Merrill

8    Lynch's liability as to each of 80,000 clients, "any competently crafted class complaint literally

9    raises common 'questions.'"  *Wal-Mart*, *supra*, 131 S. Ct. at 2550-51.  Commonality under Rule

10   23(a)(2) requires that the common question "must be of such a nature that it is capable of classwide

11   resolution—which means that determination of its truth or falsity will resolve an issue that is central

12   to the validity of each one of the claims in one stroke."  *Id.* at 2551.  Here, Plaintiff has not proposed

13   a realistic means for classwide resolution of the common question:  did Defendant obtain consent to

14   record the call.  In sum, Plaintiff has not demonstrated that there is a "common" question so as to

15   satisfy the commonality prong of Rule 23(a).

16   Determining liability as to an entire class of 80,000 based upon only the testimony of one

17   employee in one call center can only comport with Rule 23 and the due process safeguards

18   underlying Rule 23 *if* sufficient evidence exists to support a finding that the factors leading to

19   liability are, indeed, substantially similar for everyone in the class.  Here, Plaintiff attempts to

20   leapfrog over the primary question that the Court must answer by arguing, incorrectly, that the issue

21   of liability is not relevant to the class certification analysis.  (Mot. 3-4; Reply 3.)  Plaintiff has not

22   shown uniformity among putative class members to try this or any other issue[10] as a class action.

_____

23   [9] At oral argument, Plaintiffs' counsel suggested that the Court could take judicial notice of the "boiler room"
24   environments in call centers to establish that Ms. Fitzgerald heard the telephone conversations of all
     Separation Team members in the Waltham, Massachusetts call center.  The Court declines.

25   [10] Most, if not all, claims of the putative class members are time-barred under California's one-year statute of
26   limitations—Plaintiff filed this lawsuit on February 7, 2011, over one year after most if not all California
     clients had been called.  The TAC was able to withstand a motion to dismiss by alleging equitable tolling of
27   the statute of limitations under the delayed discovery rule.  Although Merrill Lynch argues in its Opposition
     that it will raise the statute of limitations affirmative defense, Plaintiff never addresses whether equitable
28   tolling of the statute of limitations under the delayed discovery rule is suitable for determination on a
     classwide basis.  As such, Plaintiff has not shown that "questions of law or fact common to class members

Based on the foregoing analysis, Plaintiff has failed to satisfy the commonality requirement and, accordingly, Plaintiff has failed to show that common issues predominate over individual issues.

## III.     CONCLUSION

For the reasons set forth above, the Motion for Class Certification is **DENIED**.

This Order terminates docket number 67.

**IT IS SO ORDERED.**

Date: February 19, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

predominate over any questions affecting only individual members" with respect to Merrill Lynch's statute of limitations defense.  _See_ Fed. R. Civ. P. 23(b)(3).